IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

ANDY JOEL ABREU,

       Plaintiff,

vs.                              CASE NO. 1:16-cv-1-WTH-GRJ

NANCY A. BERRYHILL,
Acting Commissioner of
Social Security,[1]

       Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff appeals to this Court from a final decision of the Acting

Commissioner of Social Security (the "Commissioner") denying Plaintiff's

claim for Supplemental Security Income ("SSI"), which he had received

before he turned 18 based on disability as a child. (ECF No. 1.) The

Commissioner has answered (ECF No. 8), and both parties have filed

briefs outlining their respective positions. (ECF Nos. 17 &18.) For the

reasons discussed below, it is recommended that the Commissioner's

decision be affirmed.

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on
January 23, 2017. Accordingly, pursuant to Fed. R. Civ. P. 25(d), Nancy A. Berryhill
should be substituted for former Acting Commissioner of Social Security, Carolyn W.
Colvin, as Defendant in this matter. The Clerk is directed to correct the docket
accordingly.

# I.  PROCEDURAL HISTORY

As a child Plaintiff received SSI based on disability. (R. 23.) When Plaintiff turned eighteen, his eligibility for disability was redetermined based on the rules used for determining disability in adults. (R. 83.) He alleged disability due to blindness. (R. 186.) In March 2012, Plaintiff was found no longer disabled as of April 2012. (R. 89.) Plaintiff then appointed his father as his representative in June 2012. (R. 98.) After a hearing, the decision was upheld on reconsideration. (R. 92–93, 104–08.) Plaintiff then requested a hearing by an administrative law judge ("ALJ"), which was scheduled for August 27, 2013. (R. 119, 121.) After that hearing was continued for the purpose of acquiring additional medical records, another hearing was scheduled for January 14, 2014. (R. 152.) Following that hearing, the ALJ issued a decision unfavorable to Plaintiff. (R. 23–30.) The Appeals Council denied Plaintiff's request for review. (R. 1–3, 19.) On January 4, 2016, Plaintiff filed the instant appeal. (ECF No. 1.)

# II.  STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence. *See* 42 U.S.C. § 405(g) (2000). Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create

a suspicion of the existence of a fact, and must include such relevant

evidence as a reasonable person would accept as adequate to support the

conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing

*Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), *Richardson v.*

*Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971));

*accord Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial

evidence, the district court will affirm, even if the reviewer would have

reached a contrary result as finder of fact, and even if the reviewer finds

that the evidence preponderates against the Commissioner's decision.

*Edwards*, 937 F.2d at 584 n.3; *Barnes v. Sullivan*, 932 F.2d 1356, 1358

(11th Cir. 1991). The district court must view the evidence as a whole,

taking into account evidence favorable as well as unfavorable to the

decision. *Foote*, 67 F.3d at 1560; *accord Lowery v. Sullivan*, 979 F.2d 835,

837 (11th Cir. 1992) (holding that the court must scrutinize the entire

record to determine reasonableness of factual findings); *Parker v. Bowen,*

793 F.2d 1177 (11th Cir. 1986) (finding that the court must also consider

evidence detracting from evidence on which the Commissioner relied).

However, the district court will reverse the Commissioner's decision on

plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Dep't Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505 (2005).[2] The impairment must be severe, making Plaintiff unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505–404.1511.

The ALJ must follow five steps in evaluating a claim of disability. 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991). First, if a claimant is working at a substantial gainful activity, he is not disabled. 20 C.F.R. §

---

[2] All further references to 20 C.F.R. will be to the 2005 version, unless otherwise specified.

404.1520(b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit his physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is disabled. 20 C.F.R. § 404.1520(d). Fourth, if a claimant's impairments do not prevent him from doing past relevant work, he is not disabled. 20 C.F.R. § 404.1520(e). Fifth, if a claimant's impairments (considering his residual functional capacity ("RFC"), age, education, and past work) prevent him from doing other work that exists in the national economy, then he is disabled. 20 C.F.R. § 404.1520(f).

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff. *Walker v. Bowen*, 826 F.2d 996, 1002 (11th Cir. 1987); *see also Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001). The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently

exists in the national economy. *Doughty*, 245 F.3d at 1278 n.2.[3] The

Commissioner may satisfy this burden by pointing to the Medical-

Vocational Guidelines (the "Grids") for a conclusive determination that a

claimant is disabled or not disabled. *Walker*, 826 F.2d at 1002 ("[T]he grids

may come into play once the burden has shifted to the Commissioner to

show that the claimant can perform other work.").

### III.  SUMMARY OF THE RECORD

## A.  Medical Evidence

Plaintiff's medical history is centered around his vision impairments

only. As a brief history, Plaintiff was born with cataracts in both eyes, and

he had cataract extraction surgery at Shands in his left eye at three months

old and in his right eye at six months old. (R. 253.) Because Plaintiff does

---

[3] In *Doughty* the court explained this burden shifting as follows:

> In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.

*Id.* (internal citations omitted).

not see a doctor on a regular basis, however, there were not many medical records regarding his treatment.

Plaintiff was evaluated in February 2010 at Bascom Palmer Eye Institute. His examination revealed hand motion vision in the right eye and 20/60 vision in the left eye with glasses. The doctor's impression was that Plaintiff had congenital cataracts that were removed as a child, and he was left aphakic with a posterior keratoconus or Peters' anomaly in the right eye. His intraocular pressure was elevated with glaucomatous cupping, and the doctor was unsure of the visual potential of Plaintiff's right eye. The doctor started Plaintiff on eye drops for the right eye. The doctor felt that Plaintiff should wear glasses or contact lenses before considering a secondary intraocular lens implantation. (R. 243–51.)

Plaintiff continued to visit Bascom Palmer Eye Institute for treatment in 2010 and 2011 regarding congenital cataracts and aphakia. His vision in 2010 was hand motion without direction and 20/60 with glasses in May and then later 20/hand motion and 20/50 with glasses. Plaintiff did not report ocular plain, and he was inconsistently using his glaucoma medications. In 2011, he had an ocular evaluation performed. His vision was 20/60 and then 20/70 on a recheck.  (R. 235–42.)

In March 2012, Dr. Ramjattan examined Plaintiff and prepared a Florida Department of Health visual evaluation report. Plaintiff's diagnosis included aphakia, aphakic glaucoma, and nystagmus in the right eye as well as aphakia and nystagmus in the left eye. Plaintiff's visual acuity in his right eye without correction was hand motion 2 feet (distance) and hand motion (near). In his left eye without correction, it was 20/400 (distance) and 20/400 (near). With Plaintiff's best correction, his right eye was hand motion 2 feet (distance) and hand motion (near). His left eye was 20/60 (distance) and 20/30 (near) with correction. Plaintiff's bilateral acuity, with pinhole and glasses was 20/60. The doctor noted that Plaintiff's vision can be improved with glasses. (R. 253–55.)

In July 2012, Plaintiff had an ophthalmic examination in 2012 at the Florida Ophthalmic Institute by the same doctor for the purpose of re-evaluation. Plaintiff had since visited Bascom Palmer Eye Institute, where they found that his glaucoma had improved, and his disability checks stopped. The changes in Plaintiff's visual acuity since his March examination were that his visual acuity in his right eye without correction was hand motion 3 feet (distance) and 20/800 (distance) in his left eye. With Plaintiff's best correction, his right eye was hand motion 3 feet

(distance) and his left eye was 20/50 (distance) and 20/40 (near) with correction. The other visual acuity results were the same as in March. The doctor again noted that Plaintiff's vision can be improved with glasses, and also noted that this improvement is limited due to nystagmus in both eyes. Further, the doctor stated that his vision cannot be improved with surgery. (R. 265–70.)

## B.  Opinion Evidence

### 1. Dr. Hankins

In March 2012, a state agency medical consultant, Dr. Gloria Hankins, completed a physical residual functional capacity assessment on Plaintiff. Plaintiff had no exertional, postural, or communicative limitations. Plaintiff did, however, have visual limitations. Plaintiff had limited near and far acuity. Plaintiff also had the environmental limitation of avoiding concentrated exposure to hazards, such as machinery and heights. Dr. Hankins concluded that Plaintiff's impairment was not severe and did not affect his function. (R. 256–63.)

### 2. Dr. Brigety

In August 2012, Dr. Reuben Brigety also completed a physical residual functional capacity assessment. Dr. Brigety found that Plaintiff had

the following exertional limitations: occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; and stand, sit, and walk each for about six hours in an eight-hour workday. Dr. Brigety based this assessment on Plaintiff's history of congenital cataracts, anterior segment disc genesis for which Plaintiff is aphakic in both eyes and has typical features of posterior keratoconous and Peter's anomaly, and asthma. (R. 271–73.)

Plaintiff's postural limitations included only occasionally climbing ramps and stairs, and never climbing ladders, ropes, or scaffolds. Additionally, although Plaintiff did not have any manipulative or communicative limitations, Plaintiff had limited far acuity and depth perception for visual limitations. Further, Plaintiff's environmental limitations included avoiding concentrated exposure to fumes, odors, dusts, gases, and poor ventilation as well as avoiding even moderate exposure to hazards, including machinery and heights, due to Plaintiff's history of asthma. (R. 273–75.)

Overall, Dr. Brigety concluded that Plaintiff is blind and that Plaintiff's allegation is partially credible. He also stated that the severity of Plaintiff's limitations is reflected in the RFC as stated above. (R. 276.)

### 3. Medical Expert

Thomas Rowe, a medical expert, reviewed Plaintiff's record and provided a medical opinion in June 2013. He listed Plaintiff's impairments as bilateral aphakia, aphakia glaucoma in the right eye, nystagmus, and a central corneal scar on his right eye. He opined that Plaintiff's impairments, combined or separately, failed to meet or equal any listed impairment. The medical expert stated that Plaintiff would have limited ability to distinguish fine detail due to his nystagmus and have a limited ability to do fine work. Plaintiff should, however, be able to read normal print. As for restrictions, he stated that Plaintiff should avoid working at unprotected heights and around moving and hazardous machinery and ladders. But Plaintiff should be able to avoid ordinary hazards such as boxes and water on the floor. The medical expert also noted that there were no vision-related limitations or restrictions provided by any examining physicians in the record.  (R. 222–24.)

### C.  Hearing Testimony

At the start of the hearing on January 14, 2014, the ALJ mentioned a previous hearing where additional testing and medical records were discussed. The hearing was continued due to a situation regarding

*Case No. 1:16-cv-1-WTH-GRJ*

additional testing at Bascom Palmer. The ALJ noted that when they contacted Bascom Palmer, there was no new medical evidence. It was stated that Plaintiff's appointment for additional testing was rescheduled for February 12, 2014. The ALJ also mentioned that she sent Plaintiff's medical record to an eye doctor for advice on the severity of Plaintiff's conditions and their impact on his ability to work. (R. 42–46.)

The ALJ also noted that Plaintiff was unable to retain an attorney. The ALJ then addressed Plaintiff's father, stating "that had been the fact the last time, and I told you, sir, that I would allow you to sit in the next time and be both dad and, you know, assist him in representing himself." Plaintiff agreed to his father's representation. (R. 47.)

The ALJ also discussed the records that she reviewed. She stated that the only records she had were Bascom Palmer, ending in 2011; Florida Ophthalmologic Institute, ending in 2012; and an examination they did again in 2012. She then asked whether there were any additional treatment that would assist in proving disability and whether Plaintiff visited Shands for treatment. Plaintiff stated that the last time he went to Shands was two years ago due to an emergency eye situation. Plaintiff had not been at Shands recently for any drops or treatment. Plaintiff also stated

that he does not see any doctor on a regular basis, and he has not been to any urgent care type clinic or any emergency room other than Shands, which was two years ago. The ALJ concluded that she would contact Shands to receive the ER record and then wait for the results of the future Bascom Palmer appointment. Plaintiff stated that there were no other doctors to contact for additional records. (R. 49–52.)

The ALJ then asked how Plaintiff was receiving glaucoma drops. Plaintiff's father stated that they were using drops, but it was causing Plaintiff pain in his eyes. His last prescription expired about two years ago, and they went to Bascom Palmer a year ago for a different drops. That drop, however, was not approved by Medicaid. The doctor then changed the drops, but it was causing Plaintiff pain, so they stopped using the drops. Plaintiff stopped having pain after he stopped using the drops. (R. 51–52.)

Plaintiff's father testified first at the hearing. He testified that Plaintiff is very smart and capable of doing some work, but that the limitation of his eyes limits almost everything. His father stated that no employer would hire Plaintiff because his vision is 20/50, and he cannot see anything in his right eye. Plaintiff's father also stated that it would be very difficult for Plaintiff if

he lost his benefits. (R. 55–58.)

The ALJ then noted that Plaintiff has taken classes, plays video games, watches television, uses a computer, and can use a microwave. Based on these activities and the documentation that Plaintiff can see screens, the ALJ asked Plaintiff's father what restrictions eliminate Plaintiff's ability to do work. His father replied, "Well, honestly, again, there's no restrictions. He can do work." He stated that he had been talking to friends, and nobody wants to hire Plaintiff. (R. 59–60.)

Plaintiff's father's is of the view that the ophthalmology center that examined Plaintiff made a mistake. As a result, Plaintiff's father asserts that the test did not prove that Plaintiff's angular vision is approved by Social Security. He argued that the test was inaccurate. In response, the ALJ told them to have the test performed again at Bascom Palmer. (R. 61–62.)

The ALJ asked again why Plaintiff cannot work. Plaintiff's father reiterated that he can work but that no one will hire him. He stated that the structure of society will not allow Plaintiff to have a job. The ALJ responded that vocational rehabilitation is useful for people in Plaintiff's situation who on immediate presentation appear unable to work. Vocational rehabilitation

helps those people obtain employment. Plaintiff's father said that Plaintiff

wants to work, and that he can and does do things, such as helping his

father with mechanic work. But again, he stated that it is hard for Plaintiff to

be productive in this society. (R. 63–64.)

Plaintiff then testified. The ALJ started by asking Plaintiff whether he

had received his GED. Plaintiff stated that he passed the first four tests,

but something prevented him from taking the final test, and now he must

take all of them again. He was supposed to take them the following month.

(R. 66–67.)

The ALJ then asked Plaintiff about his limitations. Plaintiff stated that

he feels that he is capable of work, but because he cannot see from his

right eye, this causes him problems such as bumping into things or

blanking out when he is not doing anything or there is no sound. Despite

his complaints, however, Plaintiff also stated that he still plays video games

and goes on the computer. He can also use a microwave and fix his own

food. (R. 68–69.)

As closing remarks, Plaintiff's father stated that Plaintiff is disabled,

but he could be productive. Additionally, he stated that taking away the

economic assistance would be a disaster at that point in time. (R. 69.)

Ms. Hayes, the vocational expert ("VE"), testified next. The ALJ first read to the VE the physical restrictions noted in the record by the agency of lifting and carrying 50 pounds occasionally, 25 pounds frequently; sitting, standing, and walking each for six hours in an eight-hour workday with normal breaks; never climbing ladders, ropes, and scaffolds but can occasionally climb ramps and steps; frequently balance, stoop, kneel, crouch, and crawl; and avoid hazards, heights, concentrated exposure to dust, fumes, odors, and gases. (R. 70–71.)

Then, specifically regarding Plaintiff's eyes, the ALJ relied upon the limitations in the doctor's residual functional capacity report. The ALJ asked the VE to assume that Plaintiff should avoid work at unprotected heights and around moving and hazardous machinery and ladders, but he should be able to avoid ordinary hazards, such as boxes and water on the floor. Plaintiff's fine detail would be limited, and he would be limited in far acuity and depth perception but not near acuity, accommodation, color vision, or field of vision. The doctor noted that with correctable lenses, Plaintiff's good eye is 20/60. (R. 71.)

Based on the above restrictions, the VE stated that the hypothetical would be at the medium level of exertion, which would allow an individual

with that RFC to work as a hand packer,[4] a grocery bagger, and a

sandwich maker. The VE testified that she knew those occupations would

accommodate for Plaintiff's visual limitations based on the *Dictionary of*

*Occupational Titles*, which gives information about the physical demands of

different jobs, including vision. (R. 72–73.)

    The ALJ then asked Plaintiff's father whether he believed Plaintiff

would be able to perform those jobs. Plaintiff's father stated that Plaintiff is

capable of doing many jobs, but again the problem is that no one will hire

Plaintiff because they will not take the risk. Plaintiff's father also stated that

he has tried to get him jobs, including one at GameStop—they never called

him about the job. Notably, Plaintiff's father stated that this was "not

because he didn't want to hire him because of his limitations, but probably,

I believe, there's so many people looking for jobs. Why you take the risk to

put somebody else who has some limitations?" Plaintiff's father further

stated that Plaintiff is "capable to do many work." (R. 73–75.)

    Next, the ALJ asked the VE to address vocational rehabilitation. The

VE discussed the special rehabilitation commission for people with visual

---

[4] According to the VE, a hand packer is "a person who works usually in a
manufacturing facility where once something is produced it needs to be packed into
boxes for shipping or delivery. . . . [H]and packing is, as it says, done by hand." (R. 73.)

disabilities. The VE stated that this commission has good job placement rates. After the ALJ provided additional information to Plaintiff and his father about vocational rehabilitation, the ALJ concluded with Plaintiff signing forms so that the ALJ can obtain his records from Bascom Palmer and Shands. The ALJ also stated that she would issue her decision after the Bascom Palmer records, if any, were obtained. (R. 75–79.)

## D.  The ALJ's Findings

The ALJ noted that Plaintiff, who turned 18 on January 7, 2012, was notified that he was no longer disabled as of April 1, 2012, based on a determination of disability under the rules for adults. The ALJ found that since April 1, 2012, Plaintiff had the severe impairments of bilateral aphakia, central cornea scar in right eye with glaucoma, and Nystagmus. The ALJ noted that Plaintiff has 20/60 corrected vision in his left eye. At step three of the sequential evaluation, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments. (R. 25.)

With respect to Plaintiff's residual functional capacity ("RFC") at step four of the sequential evaluation, the ALJ determined that Plaintiff has the RFC to perform medium work, except during an eight-hour workday he can

lift 20 pounds occasionally and 25 pounds frequently; he can sit, stand, and walk for six hours; and he must avoid heights, ladders, scaffolds, ropes, dangerous machines, all hazards, and concentrated exposure to dust. Further, Plaintiff cannot do work that requires fine or detail observations with limitations in far visual acuity and depth perception due to right eye vision problems. He also should not work outside due to sun glare. (R. 26.)

Despite Plaintiff's complaints at the hearing level, the ALJ concluded that Plaintiff's medically determinable impairments could reasonably be expected to cause Plaintiff's alleged symptoms but that Plaintiff's and his father's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible. First, the ALJ considered the objective medical evidence. The ALJ stated that Plaintiff's eye exams in 2010 and 2011 show that he had hand motion vision in his right eye and 20/60 vision in his left eye. Although he was born with cataracts, they were removed in 1994, leaving him with aphakic glaucoma in the right eye. Plaintiff, however, did not comply with the doctor's recommendations of eye drops and contact lenses. According to the ALJ, Plaintiff stopped using his glaucoma medicine several years prior to the

hearing and has not had any treatment since 2011. (R. 27–28.)

The ALJ then addressed Plaintiff's daily activities. Plaintiff is able to read on a computer screen and see numbers on a microwave. He also took classes for his GED and passed the first four tests without much preparation. Additionally, he plays video games. (R. 28.)

The ALJ also considered Plaintiff's consultative examinations in March and July 2012. Additionally, the ALJ considered the opinion of the state agency medical consultant at the initial level that stated that Plaintiff could perform work at all levels of exertion with limited near and far visual acuity due to blindness in the right eye as well as the reconsideration opinion that Plaintiff could do medium work but only occasionally climb ramps and stairs, never climb ladders, ropes, and scaffolds, and with limited far acuity and depth perception. Although the ALJ found that Plaintiff was more limited than determined by the non-examining state agency physicians, all of the opinions were that Plaintiff was not disabled. (R. 28.)

The ALJ determined at step four that Plaintiff has no past relevant work. At step five the ALJ found that based on the testimony of the VE, considering Plaintiff's age, education, work experience, and RFC, that

there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. Accordingly, the ALJ concluded that Plaintiff's disability ended on April 1, 2012, and he has not become disabled again since that date. (R. 29–30.)

## IV.  DISCUSSION

Plaintiff raises one argument on appeal: Plaintiff did not receive a full and fair hearing because the ALJ failed to obtain a valid waiver of counsel, and Plaintiff was prejudiced by the lack of counsel. (ECF No. 17.) The Court finds, however, that the ALJ did not fail to obtain a valid waiver of counsel, and even if she had, Plaintiff has failed to show that he was prejudiced by the lack of counsel.

At a hearing before an ALJ, a social security claimant has a statutory right to be represented by counsel. *Brown v. Shalala*, 44 F.3d 931, 934 (11th Cir. 1995); *Holland v. Heckler*, 764 F.2d 1558, 1562 (11th Cir. 1985); *Cowart v. Shweiker*, 662 F.2d 731, 734 (11th Cir. 1981). The claimant may waive this statutory right, but the waiver must be made knowingly and voluntarily. *Brown*, 44 F.2d at 934. The waiver must be viewed in the context of the entire hearing. *McCloud v. Barnhart*, 166 F. App'x 410 (11th Cir. 2006).

## A. Plaintiff's received all of the necessary pre-hearing notice regarding his right to counsel, and his waiver of counsel was made knowingly and voluntarily.

Plaintiff's waiver of counsel was knowing and voluntary, and

Plaintiff's father represented him during the hearing.[5] For a waiver to be

knowing and voluntary, the claimant must be notified of his right to be

represented by counsel prior to the hearing. *Cowart*, 662 F.2d at 734. Such

notice must include information about the possibility of obtaining free

counsel and the limitation on the recovery of attorney's fees. *Smith v.*

*Schweiker*, 677 F.2d 826, 829 (11th Cir. 1982).

Plaintiff argues that he received inadequate pre-hearing notice of his

right to counsel, ECF No. 17 at 19–20, but the record reveals otherwise.

Specifically, Plaintiff alleges that Plaintiff did not receive any information

about his local free legal services program. (R. 19.) He states that the

notice should state specifically, "Your local Social Security office has a list

of groups that can help you with your appeal." (*Id.*) Plaintiff goes on to

argue that because Plaintiff was only 20 years old and did not graduate

---

[5] A claimant may be represented by an attorney or a non-attorney. 20 C.F.R. § 416.1505. The non-attorney must be "generally known to have a good character and representation"; "capable of giving valuable help . . . in connection with [the] claim"; "not disqualified or suspended from acting as a representative in dealing with [the Social Security Administration]"; and "not prohibited by any law from acting as a representative." 20 C.F.R. § 416.1505(b).

Notably, in June of 2012, Plaintiff officially appointed his father as his representative. (R. 98.)

from high school, "it is clear that any waiver of counsel was ineffective." (*Id.* at 20.)

The record discloses that Plaintiff received all of the requisite notice regarding his right to counsel. To start, when Plaintiff filed a request for reconsideration of his disability cessation, a summary dated June 11, 2012, was provided to Plaintiff's mother. This summary contains the notation that Plaintiff does not have a representative, but Plaintiff's mother declared under penalty of perjury, "I understand that he has a right to be represented and that if he needs representation, the Social Security office or hearing office can give him a list of legal referral and service organizations to assist him in locating a representative." (R. 99.) Notably, one month later on July 11, 2012, Plaintiff appointed his father as representative. (R. 98.)

Second, along with the disability reconsideration decision dated December 19, 2012, Plaintiff was provided with information about requesting a hearing before an ALJ and the hearing process. (R. 92–93.) This information provided to Plaintiff advised him, "You may want help from a friend, lawyer or someone else. There are groups that can find you a lawyer. Some can give you a free lawyer. We can give you the names of

these groups." (R. 93.)  Further, a document entitled "Your Right to an
Administrative Law Judge Hearing and Appeals Counsel Review of Your
Social Security Case" was also included, which further stated "[t]he people
at any Social Security office can help you if you have trouble finding a
representative or if you cannot afford one." (R. 94.)

After receiving these notices, Plaintiff requested a hearing before an
ALJ. A notice of hearing scheduled for August 27, 2013 was sent to
Plaintiff.  (R. 119, 121–26.) This notice of hearing expressly advised
Plaintiff, "You may choose to have a representative help you. We will work
with this person just as we would work with you. . . . Many representatives
charge a fee. Some representatives charge a fee only if you receive
benefits. Others may represent you for free. Usually, your representative
may not charge a fee unless we approve it." (R. 123.)  To further explain
Plaintiff's right to have a representative Social Security enclosed with the
notice a document entitled "Your Right to Representation." (R. 126,
128–29.) The document entitled "Your Right to Representation" provided
detail information about what a representative can do, who can act as a
representative, what a representative can charge and how to find a
representative—including advising that there are organizations that can

help Plaintiff find an attorney or provide free legal services if Plaintiff

qualifies and advising that "Your Social Security Office has a list of

organizations that can help you find a representative." (R. 128–29.) Lastly,

Plaintiff also received this same information with the notice of hearing

scheduled for January 14, 2014. (R. 156–59.)

Thus, the record discloses that Plaintiff received all the information

that is required by case law, statutes, and regulations for adequate pre-

hearing notice—including all the information he claims was necessary for

adequate notice. *See* 42 U.S.C. § 406(c) (noting that the Commissioner

must notify claimants in writing of "options for obtaining attorneys to

represent [them]" and "the availability to qualifying claimants of

organizations which provide legal services free of charge"); *Smith*, 677

F.2d at 829.

Plaintiff next argues that the ALJ did not obtain a valid waiver of

counsel from Plaintiff at the hearing. (ECF No. 17 at 22–23.) At the

January 2014 hearing, the ALJ stated the following to Plaintiff's father:

> ALJ: So this is how we proceed, gentlemen. Obviously, you were unable to retain an attorney, that had been the fact the last time, and I told you, sir, that I would allow you to sit in the next time and be both dad and, you know, assist him in representing himself. And, sir, is that all right with you?

CLMT: Yes, ma'am.

(R. 47.) The ALJ then explained to Plaintiff's father that both he and Plaintiff would be able to testify and that Plaintiff's father would be able to discuss things with Plaintiff before answering any questions. (*Id.*)

Although the January hearing transcript reveals that the ALJ had previously discussed representation by counsel with Plaintiff and his father at the earlier August hearing, it is unclear how thorough that discussion was because there is no copy of the transcript from that hearing included in the record. Yet, Plaintiff's main argument regarding this exchange is that Plaintiff was only 20 years old and had not graduated from high school. (ECF No. 17 at 20, 24.) Nothing in the record, however, shows that Plaintiff had any mental impairment that would prevent Plaintiff from understanding his right to representation. There is no question Plaintiff was provided with all of the necessary information regarding representation by counsel prior to both hearings.

Additionally, after the ALJ discussed representation by counsel with Plaintiff at the August hearing, Plaintiff failed to obtain counsel for the January hearing despite more than sufficient time between the the two hearings to obtain counsel.

Lastly, following the January 2014 hearing, Plaintiff appointed an attorney representative in August 2014, thus evidencing that Plaintiff was not only aware of his right to attorney representation but was able to exercise the right to obtain such representation. (R. 16.)

In evaluating the waiver in the context of the hearing as a whole, it is clear that Plaintiff validly waived his right to representation by counsel, and instead chose his father to represent him during the hearing, testifying on behalf of Plaintiff and answering any of Plaintiff's questions. *See McCloud*, 166 F. App'x 410.

Accordingly, the Court concludes that "Although informed of his right to representation, the claimant chose to appear and testify with the assistance of his father." (R. 23.)  The Plaintiff therefore was fully advised prior to his hearing of his right to counsel and chose to waive this right and instead proceed with his father as his representative.

## B. Even if Plaintiff's waiver was invalid, the ALJ developed a full and fair record.

The ALJ fulfilled her duty to fully and fairly develop the record, even when evaluated in terms of the heightened duty required when a Plaintiff has not validly waived his right to representation. If a claimant does not validly waive the right to counsel, the ALJ has a special duty to develop a

fully and fair record. *Graham v.* Apfel, 129 F.3d 1420, 1423 (11th Cir.
1997); *Brown*, 44 F.3d at 934–35; Cowart, 662 F.2d at 735. The ALJ must
"scrupulously and conscientiously probe into, inquire of, and explore for all
the relevant facts." Cowart, 662 F.2d at 735 (quoting *Cox v. Califano*, 587
F.2d 988, 991 (9th Cir. 1978); *Gold v. Sec'y of Health, Educ. & Welfare*,
463 F.2d 38, 43 (2d Cir. 1972)). This requires that the ALJ be "especially
diligent in ensuring that favorable as well as unfavorable facts and
circumstances are elicited." *Graham*, 129 F.3d at 1423 (quoting *Cowart*,
662 F.2d at 735 (citations omitted)). Accordingly, the record must show
that Plaintiff was not prejudiced by a lack of counsel. *Id.*

The ALJ developed the record to the extent required of her. The ALJ
thoroughly questioned both Plaintiff and his father during the January
hearing. (R. 42–80.) The ALJ delayed the hearing from August to January
to leave the record open as Plaintiff was about to visit Bascom Palmer for
an evaluation. (R. 44, 46.) The ALJ wrote to Bascom Palmer to obtain the
records from that visit, but she was notified that the trip had been
cancelled. (*Id.*) Then, when Plaintiff stated during the hearing that the
appointment had been rescheduled to February, the ALJ stated that she
would not make her decision until she obtained those records. (R. 45–46.)

The ALJ reviewed with Plaintiff and his father the medical evidence in the record. (R. 49.) She stated that the only medical records she had to review were from Bascom Palmer, which ended in 2011, and Florida Ophthalmic Institute, ending in 2012, including an examination they performed in 2012. (R. 49–50.) The ALJ also asked Plaintiff and his father whether there were any other records that would be useful to the ALJ in making her determination. (R. 50.) Plaintiff's father advised that Plaintiff had visited the eye center at Shands two years prior to the hearing. (R. 50.) The ALJ also asked if Plaintiff visit any doctor regularly or if he had been to any emergency department, to which Plaintiff replied no. (R. 51.) Accordingly, the record discloses that the ALJ attempted to obtain records from Plaintiff's visit to Shands and from the scheduled visit to Bascom Palmer, but no additional records were available. (R. 51, 279–82.) The ALJ attempted to fill any potential gaps in the record and to explore all potential relevant facts.

Despite the ALJ's thorough attempt to develop the record during and after the hearing, Plaintiff argues that the ALJ should have used a medical expert in ophthalmology to clarify Plaintiff's vision capabilities and how his vision impairments affect Plaintiff's RFC. (ECF No. 17 at 22.) In developing

the record and making an RFC determination, the ALJ does not need to

seek independent expert medical testimony so long as the ALJ can make

an informed decision based on the existing record. *Ingram v. Comm'r of

Soc. Sec.*, 496 F.3d 1253, 1269 (11th Cir. 2007); *Wilson v. Apfel*, 179 F.3d

1276, 1278 (11th Cir. 1999).

Despite the fact that such opinion testimony is not necessary, the

ALJ reviewed and relied upon the consultative examination by Dr.

Ramjattan and the opinions of state agency medical consultants Dr.

Hankins and Dr. Brigety. (R. 256–63, 265–68, 271–78.)  Additionally, the

ALJ obtained an opinion from a medical expert, Thomas Rowe, to advise

the ALJ on the severity of Plaintiff's impairments and their affect on his

ability to do work. (R. 46, 222–24.) Thus, whether or not Plaintiff validly

waived his right to representation by counsel, the ALJ fulfilled her duty to

fully and fairly develop the record.

## C. Plaintiff has failed to prove that he was prejudiced by a lack of counsel, so there is no need to reverse and remand the ALJ's decision for further development of the record.

Plaintiff has failed to prove that he was prejudiced by his lack of

counsel at the hearing. A claimant must show that he was prejudiced by

his lack of representation to obtain the reversal and remand of an ALJ's

decision for further development of the record. *Brown*, 44 F.3d at 935. A claimant can show prejudice by demonstrating gaps in the medical record. *Id.* In other words, there must be "a showing that the ALJ did not have all of the relevant evidence before him in the record (which would include relevant testimony from claimant), or that the ALJ did not consider all of the evidence in the record in reaching his decision." *Kelley v. Heckler*, 761 F.2d 1538, 1540 (11th Cir. 1985); *see also Graham*, 129 F.3d at 1423 (finding no prejudice where no evidentiary gaps existed, the record was sufficient for the ALJ to make a decision, substantial evidence supported the ALJ's decision, and claimant did not point out evidence that would have changed the outcome); *Edwards v. Sullivan*, 937 F.2d 580, 585–86 (11th Cir. 1991) (same). The Court, however, need not determine whether having counsel would have resulted in any specific benefits to the Plaintiff. *Graham*, 129 F.3d at 1423; *Brown*, 44 F.3d at 935.

Regarding prejudice, Plaintiff first argues that a representative would have requested that the ALJ bring in a medical expert in ophthalmology to clarify what Plaintiff can see and how his lack of fine vision affects his RFC. (ECF No. 17 at 22.) Plaintiff states that Plaintiff's visual impairments were too complex and beyond the ALJ's capability of understanding without a

medical expert. (*Id.* at 21.)

To start, such an allegation regarding the ALJ's ability to understand Plaintiff's impairments is conclusory and insufficient as a reason to reverse the ALJ's decision. Additionally, as mentioned above, although the ALJ is not required to use a medical expert in making Plaintiff's RFC determination, she did obtain an opinion from medical expert Thomas Rowe prior to making her findings and relied on the opinions of Dr. Hankins and Dr. Brigety, state agency medical consultants. Accordingly, Plaintiff was not prejudiced by a lack of counsel based on this argument.

Plaintiff also argues that a representative would have pulled and filed Plaintiff's school records to show that the problems Plaintiff faced in school would mirror the problems Plaintiff would have while working. (ECF No. 17 at 22.) Not only is it a conclusory allegation that any representative would have filed Plaintiff's school records,[6] but also Plaintiff makes the inaccurate assumption that such school records would have altered the ALJ's RFC determination and been evidence of Plaintiff's disability.

The ALJ did not require Plaintiff's school records in making her RFC determination because she questioned Plaintiff about his school during the

---

[6] Notably, when Plaintiff did obtain an attorney representative, no school records—or any additional records—were filed with the Appeals Council. (R. 4, 16.)

hearing. Plaintiff testified that he completed four out of five portions of the GED, passing all of those portions. (R. 28, 67.) The reason Plaintiff did not complete the test was because he could not login to the system and not because he was not capable of passing the examination. (R. 67.) Thus, it questionable how Plaintiff's school records would have changed the ALJ's determination regarding Plaintiff's RFC. The fact that Plaintiff did not have counsel to file his school records does not demonstrate that Plaintiff was prejudiced by lack of counsel.

Plaintiff improperly relies on *Cregar v. Astrue*, No. 3:07-cv-1008-J-JRK, 2009 WL 383388 (M.D. Fla. Feb. 13, 2009), to argue that Plaintiff's waiver was invalid and that Plaintiff was prejudiced by the lack of counsel. (ECF No. 17 at 23.)  *Cregar* is not binding on this Court, and is distinguishable from this case. In *Cregar*, although the court found that Plaintiff was prejudiced by his lack of representation and the ALJ's failure to develop the record the situation there was one where "[t]he ALJ did not have any medical documentation before him pertaining to the period of disability, and he did not attempt to elicit any relevant testimony with respect to his ultimate findings." *Cregar*, 2009 WL 383388, at *8.

As discussed above this case is different.  The ALJ had before her

medial documentation upon which she relied and when advised there may be additional records she made every attempt to acquire the additional medical records from Shands and Bascom Palmer Eye Institute. (R. 26–30.)

Moreover, the ALJ had available to her opinion evidence from state agency physicians and a medical expert, all of which she utilized in making her determination (R. 28–30.)

At the hearing, the ALJ also elicited testimony from both Plaintiff and his father about Plaintiff's daily activities and the effects of his impairments on his ability to work. Both Plaintiff and his father replied that Plaintiff is capable of working, but was not working because no one would hire him. (R. 55–80.)

Overall, the record refutes Plaintiff's argument that Plaintiff's alleged failure to waive his right to counsel combined with the medical complexity of Plaintiff's impairments, the ALJ's failure to request school records, and the alleged lack of a medical expert demonstrate sufficient prejudice to require a remand. To the contrary, the record shows that there were no evidentiary gaps, the record was sufficient for the ALJ to make a determination, and substantial evidence supported the ALJ's decision.

Lastly, and most notably, Plaintiff failed to point out any evidence that would have actually changed the outcome of the case. Accordingly, the Court concludes that Plaintiff has failed to prove he was prejudiced by his lack of representation to the extent necessary to warrant reversal and remand of the ALJ's decision.  S*ee Graham*, 129 F.3d at 1423; *Edwards*, 937 F.2d at 585–86.

## V.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of the Commissioner should be **AFFIRMED**.

**IN CHAMBERS** on the 13th day of February 2017.

*s/Gary R. Jones*

GARY R. JONES
United States Magistrate Judge

### NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u> A copy of objections shall be served upon all other parties. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**